UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHANREASMEY PRUM,

Petitioner,

v.

JEFF MACOMBER,

Respondent.

No. 2:15-cv-0905-TLN-CKD P

FINDINGS AND RECOMMENDATIONS

Petitioner, a state prisoner, is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2009 conviction for first degree murder with gang enhancements, for which he was sentenced to a prison term of life without the possibility of parole, and related offenses, for which he received multiple consecutive terms ranging from five years to twenty-five-years-to-life. (ECF No. 1 ("Ptn.").) Respondent filed an answer to the petition, and petitioner filed a traverse. (ECF Nos. 15, 17.) Upon careful consideration of the record and the applicable law, the undersigned will recommend that the petition be denied.

/////

/////

/////

/////

BACKGROUND

I. Facts

In its affirmation of the judgment on appeal, the California Court of Appeal, Third Appellate District, set forth the relevant factual background as follows:

> Members of the Bloods street gang consider the area around Louis Park in Stockton to be part of their gang territory. The Original Bloods and the West Side Bloods are subsets of the Bloods gang.
>
> Hostility between members of the Bloods and members of the Norteño street gang erupted during a 2008 New Year's party with an exchange of words and gunfire. Some Bloods believed that John Tellez, Jr. (John Jr.), a Norteño, shot at Bloods at the party. There was another exchange of gunfire on January 25, 2008.
>
> Two weeks later, on February 8, 2008, John Jr. was at Louis Park with family and friends, including his father's girlfriend Renee and her children Aaron, Alana and Marissa. John Jr. wore a red sweater, a red belt with "14" on the belt buckle signifying the letter "N" for Norteño, red and black shoes, and a red and black hat. Red is the color associated with the Norteños. Red is also the color associated with the Bloods.
>
> Renee noticed four men walking towards John Jr. One of the men wore a black hoodie and had a red bandana over his nose and mouth. According to gang expert Detective Paul Gutierrez, gang members often "posse up" and cover their faces with bandanas or "mask up" when they commit a crime.
>
> John Jr. recognized the man with the red bandana as "Beast," someone he knew from the neighborhood as affiliated with the West Side Bloods. At trial, Prum admitted he was known as "Beast" and was the man in the red bandana.
>
> Prum pulled his bandana down and spoke to John Jr. in a loud and aggressive voice. He called John Jr. "Little John" and asked "What's up?" and "Where's your friends?" Prum told John Jr. "I got you now, you're slipping"[1] and said that John Jr. was lucky he was with his family otherwise Prum would "blast [John Jr.] right now." Prum called out "West Side Bloods" and his companions yelled West Side Bloods slogans. One of Prum's companions

[1] According to Detective Gutierrez, "caught slipping" describes situations where a gang member is vulnerable to attack by rivals, such as where he or she is confronted outside of his or her gang's territory.

bobbed up and down, made gang hand gestures, and called out "West Side Bloods."

Prum pulled out a MAC-10 type firearm and pointed it at John Jr. Renee ran to get her children.

John Jr. told Prum there were kids around and they would "handle it" another time. According to John Jr. a gang rule dictated that gang members do not handle "business" when family, especially children, were around. Prum told John Jr. and his group to get out of the park. John Jr.'s father said they would leave immediately. Prum and his companions walked away.

John Jr. did not yell anything or challenge anyone as he left, and neither did anyone from his group. Although John Jr. had a loaded nine-millimeter semiautomatic handgun on his person, he did not pull out his gun during the confrontation with Prum.

John Jr.'s group ran to their cars and left the parking lot quickly. Renee's son Aaron sat in the front passenger seat of Renee's car, while her daughters Alana and Marissa sat in the backseat. Gunfire erupted as the line of cars drove off. John Jr. heard gunshots coming from an area in the park with picnic tables and saw muzzle flashes where he had seen Prum and his companions walking. The shooters aimed at the fleeing cars while running alongside or toward the cars. John Jr.'s father heard close to a dozen gunshots from what sounded like three guns and saw muzzle flashes from inside the park.

After he heard gunshots, John Jr. grabbed his gun and fired 12 or 14 shots at the people in the park. After he fired his gun, John Jr. heard more than 10 shots coming back toward him.

A bullet consistent with a nine-millimeter Luger cartridge pierced the driver-side door of Renee's car. The bullet perforated Aaron's left lung and caused him to bleed to death. A criminalist opined that the bullet that killed Aaron was most likely fired from a nine-millimeter semiautomatic pistol consistent with a MAC-type firearm. Prum did not dispute that his bullet killed Aaron. A bullet also wounded Renee in her left arm.

Ballistics evidence and witness testimony showed that five firearms were used during the February 8 shooting: two nine-millimeter guns, a .45-caliber semiautomatic firearm, and two .38-caliber revolvers.

John Jr. and his father identified Prum from a photographic lineup. John Jr. also told police "Beast" was the person who confronted

him at the park. A search of two addresses associated with Prum yielded a red bandana and albums containing photographs of Prum and others displaying gang signs and wearing red clothing. Police did not find a MAC-10 firearm.

Renee told the police detectives that "Rattalack" may have been present at the Louis Park shooting. Detective Michael George determined that "Rattalack" was a name associated with Rattany Uy. Detectives interviewed Uy on March 20, 2008. The entire interview was video- and audio-recorded, and a redacted version of the recording was played to a jury at Uy's trial.

Uy told detectives the following: Uy and Prum drove by Louis Park and saw people they believed to be Norteños at the park. Uy and Prum then drove to Doray Court to recruit their "homies." They saw Michael Garduno and Deandre Cole. Prum told Garduno and Cole there were Norteños at the park and to get their guns. Garduno got a nine-millimeter gun. Cole had a revolver. Uy had a .22-caliber gun. Prum procured a nine-millimeter "submachine gun" and changed into a black hoodie. Prum, Uy, Cole and Garduno armed themselves because if the Norteños at the park "trip[ped]" the men would shoot the Norteños. As the men drove to the park they discussed shooting and separating when the shooting began. Prum and Cole said they were going to shoot the Norteños at the park because of the New Year's shooting. Prum walked up to the group in the park and drew his gun. He wore a red bandana around his neck. He was "talkin' up gang signs," called out "West Side Bloods" and said that the Norteños shot at the Bloods on New Year's. Uy, Garduno and Cole stood behind Prum. The other people walked away and Prum started walking back. Cars then began to leave. Uy saw Renee and Aaron get into their car. Prum shot first, aiming at the cars that were leaving, then Garduno and Cole ran up and fired their guns multiple times. Uy ran while shooting. He shot up in the air and did not aim at the cars.

Uy was taken into custody following his March 20 interview. He subsequently admitted to Detective Gutierrez that he stood behind some picnic tables and used a .45-caliber gun during the Louis Park shooting.

Detective Gutierrez testified at Uy and Prum's trials as an expert on Asian criminal street gangs in Stockton. The detective opined that the Bloods and, in particular, West Side Bloods and Original Bloods were criminal street gangs. Bloods have identifiable hand signs and symbols, and Original Bloods and West Side Bloods members committed crimes together. If an individual satisfied two out of nine validation criteria within a five-year period, he or she was considered a documented gang member by the Stockton Police

Department. The criteria included self-admission, associating with a documented gang member or documented gang members, participation in a gang-related crime, having "gang indicia," and information from citizen informants that the person was a gang member. According to Detective Gutierrez, Prum was an active participant in the Original Bloods because he associated with other documented members of the gang, had admitted to being a member of the gang, had participated in gang-related crimes with other Original Bloods members, and police found photographs of Prum that contain indicia of gang membership. Prum's moniker was "Beast." He was also known as "Damu" which means blood.

Detective Gutierrez opined that Uy was also an active Original Bloods member. This opinion was based on self-admission and participation in gang-related activities. In addition, police had observed Uy associating with admitted or documented Original Bloods members. The People also presented photographs showing Uy throwing gang signs and wearing apparel with gang indicia.

According to Detective Gutierrez, Cole was a documented Original Bloods member. Detective Gutierrez opined that Garduno did not meet the criteria to be considered an active member of a criminal street gang, but Garduno was a Bloods "associate."

Detective Gutierrez further opined that the Louis Park shooting was gang-related activity. In his view, defendants worked together to commit the Louis Park crimes for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in criminal activity by gang members. This opinion was based on the following: the Bloods blamed John Jr. for shooting at them on New Year's; the shooters called out "West Side Bloods" during the confrontation with John Jr.; the shooters and the Bloods gained notoriety in the community because of the shooting; the Louis Park shooting intimidated people in the community; ballistics evidence showed that the same weapon was used at Louis Park and at the prior January 25 shooting; and three documented Original Bloods members participated in the February 8 shooting.

Prum testified at his trial that he shot at John Jr. in self-defense. He provided the following narrative: On February 8, 2008, Prum saw John Jr. at Louis Park when Prum and Uy drove through the park. Prum and John Jr. had previously socialized together, but on that day there were problems between them. Prum believed John Jr. posed a danger to him and the neighborhood based on the New Year's and January 25 shootings. Prum and Uy planned to tell John Jr. to leave the park. Because he believed John Jr. might be armed, Prum asked Uy if Uy had a gun. Uy obtained a .45-caliber gun.

> Prum told Uy that Prum also needed a gun and they needed "backup." Uy recruited Cole and Garduno. Prum told Cole and Garduno they were going to the park to "punk" John Jr. and kick him out of the park. Cole and Garduno each had a .38-caliber revolver. Prum called a friend for a gun and picked up a MAC-10 for himself 10 to 20 minutes later. Prum made sure the weapon was "fully loaded" in the clip. Defendants then returned to the park. Prum parked on Pixie Drive so that his car would not be detected. He carried the MAC-10 and wore a red bandana over his face to conceal his identity. He walked up to John Jr. and told John Jr. "this [was a] West Side Blood neighborhood" and John Jr. had to leave. John Jr. indicated he would leave. John Jr. did not pull out a gun. Prum saw people running to their cars. Prum and his cohorts then walked back in the direction of his car. When he reached an area where picnic tables were located, Prum heard gunshots from behind him. He ducked down. He saw Garduno and Cole firing towards Monte Diablo Avenue. He also saw muzzle flashes on top of a sportscar on Monte Diablo Avenue. Prum pointed his MAC-10 at the sportscar and fired four to six times. After firing his weapon, Prum ran to his car with Uy, Cole and Garduno following. Prum heard gunshots as he ran to his car. He saw Uy firing his weapon. Prum dropped off Uy, Cole and Garduno at Doray Court and went to a friend's house a few blocks from the park, where he hid for an hour or so. Thereafter, Prum left for Jackson Rancheria Casino because he "wanted to get away."

Lodged Document ("Lod. Doc.") 7 at 5-11.[2] The facts as set forth by the state court of appeal are presumed correct, 28 U.S.C. §2254(e)(1), and are consistent with this court's review of the record.

II. Procedural History

Following a jury trial in the San Joaquin County Superior Court, petitioner was convicted of first degree murder (count 1).[3] Lod. Doc. 7 at 11. The jury additionally found the charged gang enhancements to be true.[4] Id. The jury also convicted petitioner on three counts of attempted premeditated murder (counts 2-4),[5] one count of shooting at an occupied motor vehicle (count 5),[6] carrying a loaded firearm by a gang participant (count 6),[7] carrying a concealed

---

[2] Lodged documents refer to documents lodged by respondent on August 28, 2015. (ECF No. 16.)

[3] Cal. Penal Code § 187, subd. (a).

[4] Cal. Penal Code § 186.22, subd. (b)(1); § 190.2, subd. (a)(22).

[5] Cal. Penal Code § 187, subd. (a); § 664, subd. (a).

[6] Cal. Penal Code § 246.

firearm by a gang participant (count 7),[8] possession of a firearm by a felon (count 8),[9] and active participation in a criminal street gang (count 9).[10] Id.

The trial court sentenced petitioner to state prison for life without the possibility of parole for the first degree murder conviction, plus three consecutive terms of fifteen years to life for the attempted murder convictions, and a consecutive five-year term for the shooting at an occupied vehicle conviction. Id. at 2. The trial court also imposed three twenty-five years to life terms for the firearm enhancements, a ten year term for a gang enhancement on count 4, and minimum fifteen-year terms for California Penal Code§ 186.22 enhancements on counts 1, 2, 3, and 5. Id.

Petitioner appealed the judgment to the California Court of Appeal, Third Appellate District along with codefendant Uy. Lod. Docs. 1, 2, 3. On December 31, 2013, as to petitioner, the court of appeal reversed the judgment on counts 6 and 7 and further modified the judgment to strike the life sentences imposed pursuant to California Penal Code section 186.22(b)(1) on the convictions for counts 1, 2 and 3, and the 10-year prison term enhancement on the conviction for count 4. Lod. Doc. 4 at 51. It also modified the judgment to reflect that petitioner was sentenced on the count 5 conviction to a term of fifteen years to life in prison. Id. In all other respects the judgment with regard to petitioner was affirmed. Id.

Petitioner and Uy filed petitions for review in the California Supreme Court. Lod. Doc. 5. The Court summarily denied petitioner's petition on April 30, 2014. Lod. Doc. 6. However, it granted review of Uy's petition, but deferred briefing. Id. The Court subsequently transferred the matter back to the court of appeal "with directions to vacate [the court of appeal's] decision and to reconsider the cause in light of [People v. Gutierrez, 58 Cal. 4th 1354 (2014)]." Lod. Doc. 7 at 3. On November 14, 2014, the court of appeal issued a second opinion, which was exactly the same as its first opinion insofar as it pertained to petitioner.[11] Lod. Doc. 7. Petitioner filed a

---

[7] Cal. Penal Code § 25850, subd. (c)(3).
[8] Cal. Penal Code § 25400, subd. (c)(3).
[9] Cal. Penal Code § 29800.
[10] Cal. Penal Code § 186.22, subd. (a).
[11] The court of appeal's opinion as to petitioner was identical to its first opinion issued on December 31, 2013. The California Supreme Court's direction to reconsider the case in light of the ruling in Gutierrez pertained exclusively to petitioner's codefendant Uy. See Lod. Docs. 6-7.

second petition for review in the California Supreme Court, which was summarily denied on February 18, 2015. Lod. Docs. 8, 9.

Petitioner filed a state habeas petition in the San Joaquin County Superior Court on July 29, 2014, which was denied in a written decision on September 11, 2014. Lod. Docs. 10, 11. Petitioner filed a second state habeas petition in the California Court of Appeal, Third Appellate District, which was summarily denied on June 18, 2015. Lod. Docs. 12, 13. Petitioner filed a third state habeas petition in the California Supreme Court on December 1, 2014, which was summarily denied on February 18, 2015. Lod. Docs. 14, 15.

Petitioner filed the instant federal habeas petition on April 27, 2015. Ptn. Respondent filed an answer on August 28, 2015. ECF No. 15. Petitioner filed a traverse on September 21, 2015. ECF No. 17.

ANALYSIS

I. AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

of any indication or state-law procedural principles to the contrary." Id. at 784-785 (citing Harris v. Reed, 489 U.S. 255, 265 (1989)) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, 131 S. Ct. at 785 (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-787. Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

II. Petitioner's Claims

A. Collateral Estoppel

First, petitioner argues that his murder conviction was barred by the doctrine of collateral estoppel because two of his codefendants, Michael Garduno and Deandre Cole, pleaded guilty to voluntary manslaughter for the shooting death of Aaron prior to trial, suggesting that the state had determined that the facts of the homicide resulted in manslaughter, not murder. Accordingly, petitioner contends, the trial court that tried and sentenced him for first degree murder acted in excess of its jurisdiction in doing so. Petitioner raised this argument in his state habeas petitions. Lod. Docs. 10, 12, 14. He asserts that the state courts unreasonably denied this argument.

/////

1. State Court Decision

In the last reasoned decision on this claim,[12] the San Joaquin County Superior Court wrote:

> Petitioner contends that his murder conviction was barred based on the doctrine of collateral estoppel and, as a result, the trial court that tried and sentenced him acted in excess of its jurisdiction in doing so.
>
> Petitioner maintains that he was originally charged along with three codefendants, Michael Garduno, Rattany Uy, and Deandre Cole. Prior to Petitioner's trial, Garduno and Cole entered guilty pleas to voluntary manslaughter with regards to the death of Aaron Allen Kelly. Petitioner now argues that the doctrine of collateral estoppel establishes, by virtue of the Garduno and Cole pleas, that the death of Aaron Allen Kelly was determined to be manslaughter and precluded his conviction of murder.
>
> Petitioner's own written argument summarizes and sets forth the elements of the doctrine of collateral estoppel. "Collateral estoppel bars relitigation of an issue decided at a previous (or previously final) proceeding only if: the issue was actually litigated and necessarily decided at the previous proceedings; (2) the issue so litigated and decided is identical to the issue currently before the court; (3) the previous proceeding resulted in a final judgment on the merits; and (4) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the previous proceeding. [Citations.]" (Present petition, pp. 17-18.)
>
> However, California courts have long held that a judgment based on a guilty plea is not entitled to collateral estoppel effect. (People v. Blackburn (1999) 72 Cal.App.4th 1520, 1528, citing People v. Fuentes (1986) 183 Cal.App.3d 444, 449-453; People v. Camp (1970) 10 Cal.App.3d 651, 653-654.) The outcome of proceedings against one co-defendant do not have effect on the trial of a different defendant. (Standefer v. U.S. (1980) 447 US 10, 100 S.Ct. 1999; People v. Summersville (1995) 34 CA4th 1062. See People v. Palmer (2001) 24 C4th 856, overturning common law rule that acquittal of all other co-conspirators bars conviction of the remaining defendant.) Nonmutual collateral estoppel does not apply in criminal cases. (People v. Superior Court (Sparks) (2010) 48 C4th 1, 5.)

[12] Petitioner also raised this claim in his habeas petitions filed in the California Court of Appeal, Third Appellate District and the California Supreme Court, but both courts summarily denied the petitions without comment. Lod. Docs. 12, 13, 14, 15.

Lod. Doc. 11 at 2.

2. Legal Standards

Collateral estoppel or issue preclusion "prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding." Shaw v. Hahn, 56 F.3d 1128, 1131 (9th Cir. 1995). "The party asserting collateral estoppel must show that the estoppel issue is identical to an issue litigated in a previous action." Kamilche Co. v. United States, 53 F.3d 1059, 1062 (9th Cir. 1995). Additionally, "the issue to be foreclosed in the second litigation must have been litigated and decided in the first case." Id. (citing Starker v. United States, 602 F.2d 1341, 1344 (9th Cir. 1979)) (internal quotations omitted). The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding, not just the particular arguments that were raised in support of the first decision. Id. (citing Yamaha Corp. of America v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992), cert. denied, 506 U.S. 1078 (1993)).

The Ninth Circuit Court of Appeals has used the following criteria for the application of collateral estoppel in an action involving a criminal matter:

> (1) the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there must have been a full and fair trial to prevent convictions of doubtful validity from being used; (3) the issue on which the prior conviction is offered must of necessity have been decided at the criminal trial; and (4) the party against whom the collateral estoppel is asserted was a party or in privity with a party to the prior trial.

United States v. Real Prop. Located at Section 18, Twp. 23, Range 9, Sunnyview Plat, Lots 4 & 5, Block 4, Lakeview Dr., Quinault Lake, Olympic Nat. Park, Grays Harbor Cty., WA., 976 F.2d 515, 518 (9th Cir. 1992) (quoting Ayers v. City of Richmond, 895 F.2d 1267, 1271 (9th Cir. 1990)). Furthermore, the Supreme Court has ruled that nonmutual collateral estoppel, i.e., the invocation of the doctrine by a non-party to the original litigation, cannot be used by a criminal defendant not a party to the original prosecution against the government in his or her own criminal case. United States v. Mendoza, 464 U.S. 154, 160 (1984) (finding "[a] rule allowing

nonmutual collateral estoppel against the government in such cases would substantially thwart the development of important questions of law"); Standefer v. United States, 447 U.S. 10, 22-25 (1980) (holding that nonmutual collateral estoppel does not apply against the government in criminal cases).

3. Discussion

Here, the state court denied petitioner's collateral estoppel claim on the basis that petitioner sought to apply the doctrine nonmutually to bar the government from prosecuting him for murder. Lod. Doc. 11 at 2. This was a reasonable application of clearly established Supreme Court precedent. See Mendoza, 464 U.S. at 160; Standefer, 447 U.S. at 22-25. Furthermore, as the state court correctly noted, a judgment based on a guilty plea is not entitled to collateral estoppel effect. See Standefer, 447 U.S. at 22 ("[I]n a criminal case, the Government is often without the kind of 'full and fair opportunity to litigate' that is a prerequisite of estoppel.") Accordingly, petitioner was not entitled to claim that his codefendants' guilty pleas to the lesser offense of voluntary manslaughter estopped the government from convicting petitioner of murder.

Petitioner argues in his traverse that the doctrine of collateral estoppel should have been applied by the state court here even in light of the Supreme Court's clearly established precedent because barring him from doing so would render petitioner's murder conviction inconsistent with the plea bargains of his codefendants for the lesser crime of voluntary manslaughter. However, inconsistent verdicts do not invalidate convictions, under either federal constitutional law or California state law. United States v. Powell, 469 U.S. 57, 63, 68-69 (1984); Masoner v. Thurman, 996 F.2d 1003, 1005 (9th Cir. 1993); Cal. Pen. Code § 954; People v. Santamaria, 8 Cal. 4th 903, 911 (1994). Accordingly, petitioner's contention is without merit.

In short, the state court reasonably applied clearly established Supreme Court precedent to deny petitioner's collateral estoppel claim. Accordingly, petitioner's collateral estoppel claim here should be denied.

B. Instructional Error

Second, petitioner argues that the state trial court's jury instruction regarding murder, CALCRIM No. 520, as given in his case was faulty and had a substantial and injurious effect on

the outcome of his trial. Petitioner contends that the instruction was faulty because it failed to express to the jury that it was the instruction defining second degree murder. Petitioner argues that this instruction had a substantial and injurious effect on the outcome of his trial in violation of his due process rights because it effectively removed the option of second degree murder from the jury's consideration when deliberating. Petitioner raised this argument in his state habeas petitions. Lod. Docs. 10, 12, 14. He asserts that the state courts unreasonably denied this argument.

1. State Court Decision

In the last reasoned decision on this claim,[13] the San Joaquin County Superior Court wrote:

> Plaintiff [*sic*] argues that a recent unrelated finding by the Court of Appeals regarding CALCRIM jury instruction no. 520 results in the conclusion that it had a "substantial and injurious effect" on the judgment in Petitioner's case.
>
> Petitioner's argument is based on what is purported to be a decision by the Sixth District Court of Appeals in In re Dung Huu Tran. However, no published opinion for this case can be found. Petitioner submits a motion for judicial notice filed by Tran in a petition for writ of habeas corpus (Petitioner's Ex. 2). This document bears no file stamp, case number or any indicia of authenticity. However, it does include what it terms a "question[s] of fact" regarding the failure of CALCRIM 520 to explain the specific elements required for a finding of second degree murder in Mr. Tran's case.
>
> Petitioner is mistaken as to the precedential value of this evidence. A review of the Tran case using the case number Petitioner has provided (H039425) at the website for the Sixth District Court of Appeals (as well as Petitioner's Request for Judicial Notice, Ex. G) reveals that while the Request for Judicial Notice in the Tran matter was granted, the petition for habeas corpus in which it was filed was denied on August 16, 2013. The granting of a Request for Judicial Notice is not a stamp of approval for the facts alleged or theories presented within. "Courts can take judicial notice of the existence, content and authority of public records and other

---

[13] Petitioner also raised this claim in his habeas petitions filed in the California Court of Appeal, Third Appellate District and the California Supreme Court, but both courts summarily denied the petitions without comment. Lod. Docs. 12, 13, 14, 15.

> specified documents, but do not take notice of the truth of the factual matters asserted in those documents." (Ghaski v. Bank of America, National Association (2013) 218 Cal.App.4th 1079, 1090, citing Mangini v. R.J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1063.) Even if Petitioner were correct in his argument that the Sixth District set forth an interpretation of CALCRIM 520 that is applicable to Petitioner's case (and this court is expressly not finding that it has), the trial courts in San Joaquin County, as part of the Third Appellate District, are not bound by the decisions of the Sixth District Court of Appeals.

Lod. Doc. 11 at 2-3.

2. Legal Standards

A challenge to jury instructions does not generally state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). Habeas corpus is unavailable for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Hayes v. Woodford, 301 F.3d 1054, 1086 (9th Cir. 2002); Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987). However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (stating that to prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process."). The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining whether an error had "a substantial and injurious effect" on the outcome of the trial. See McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993).

In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even universally condemned,' but must violate some due process right guaranteed by the fourteenth amendment." Prantil, 843 F.2d at 317 (quoting Cupp v. Naughten,

414 U.S. 141, 146 (1973)). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). The United States Supreme Court has cautioned that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). Further, in reviewing a challenged instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); see also United States v. Smith, 520 F.3d 1097, 1102 (9th Cir. 2008).

3. Discussion

Here, petitioner represents in his petition that the trial court instructed the jury on three different types of homicide with regard to petitioner's murder charge: first degree murder, second degree murder, and voluntary manslaughter. Ptn. at 22. Petitioner concedes that the legal substance of the trial court's use of CALCRIM No. 520 to instruct the jury correctly identified what the prosecution was required to prove for second degree murder, but contends that the trial court's failure to also express to the jury that the instructions contained in CALCRIM No. 520, in and of themselves, define second degree murder was prejudicial. Id. at 25. Petitioner also represents in his petition that the trial court instructed the jury further using the instructions contained in CALCRIM No. 521, which address additional requirements for first degree murder under California law. (Id.) As petitioner notes in his traverse, the bench notes for CALCRIM No. 520 specifically state that "[i]f the defendant is charged with first degree murder, give this instruction and CALCRIM No. 521, First Degree Murder. If the defendant is charged with second degree murder, no other instruction need be given."

Because the trial court instructed the jury on both first degree and second degree murder, it provided the jury with instructions contained in both CALCRIM No. 520 and CALCRIM No. 521. Petitioner asserts that the trial court prejudiced him by providing both instructions but not specifically clarifying that the requirements for second degree murder were contained within

CALCRIM No. 520 by itself. However, petitioner fails to point to anything in the record that would indicate that there was a reasonable likelihood that the non-inclusion of such a clarification confused the jury on the state of the law to the extent that it "so infected the entire trial that the resulting conviction violate[d] due process." Prantil, 843 F.2d at 317; see also Estelle, 502 U.S. at 72. Therefore, the state court was not unreasonable in denying petitioner's claim and petitioner's claim here should be denied.

C. Ineffective Assistance of Appellate Counsel

Finally, petitioner contends that the appellate counsel that represented him on direct appeal in the California Court of Appeal, Third Appellate District and California Supreme Court was ineffective for failing to raise the above collateral estoppel and jury instruction claims, and for continuing to represent petitioner after petitioner had filed a lawsuit against her, which created a conflict of interest for which prejudice is presumed. Petitioner raised these arguments in his state habeas petitions. Lod. Docs. 10, 12, 14. He asserts that the state courts unreasonably denied these arguments.

1. State Court Decision

In the last reasoned decision on this claim,[14] the San Joaquin County Superior Court wrote:

> Petitioner argues that his appointed appellate counsel's performance was ineffective for failing to raise two crucial issues on appeal and for continuing to represent him after he filed suit against her in federal court.
>
> Petitioner has submitted (Request for Judicial Notice, Ex. E) a copy of a complaint filed in the U.S. District Court for the Eastern District of California on December 4, 2013. He is listed as plaintiff and his court-appointed appellate counsel, Rebecca P. Jones, is listed as defendant. This only indicates that Petitioner filed this complaint form with the court. Petitioner submits no evidence as to the present status of this lawsuit.

////

[14] Petitioner also raised this claim in his habeas petitions filed in the California Court of Appeal, Third Appellate District and the California Supreme Court, but both courts summarily denied the petitions without comment. Lod. Docs. 12, 13, 14, 15.

> Furthermore, Petitioner's claim that his appellate counsel was ineffective is based on her failure to raise the arguments that: (1) his conviction of murder was precluded by the doctrine of collateral estoppel, and (2) CALCRIM no. 520 should not have been given. Both of these arguments are discussed above and Petitioner has failed to show that they have merit.

Lod. Doc. 11 at 3.

2. Legal Standards

The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims. See Strickland v. Washington, 466 U.S. 668 (1984). First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690. The court must then determine, whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id. Second, a defendant must affirmatively prove prejudice. Id. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985); United States v. Schaflander, 743 F.2d 714, 717-718 (9th Cir. 1984) (per curiam).

As to ineffective assistance claims in the federal habeas context, the Supreme Court has instructed:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at ----, 129 S. Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 131 S. Ct. 770, 787-788 (2011) (parallel citations omitted).

3. Discussion

With regard to petitioner's claim that his appellate counsel acted deficiently by not raising the collateral estoppel and jury instruction claims he asserts above, the court notes that those claims lack merit for the reasons discussed above. Defense counsel has no constitutional obligation to raise every nonfrivolous issue requested by the defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983). Moreover, as the Ninth Circuit Court of Appeals has noted, "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989). Accordingly, the mere fact that petitioner's appellate counsel failed to raise the non-meritorious claims petitioner asserts above does not establish that his counsel was ineffective. See id. The state habeas court addressed the fact that petitioner's two claims asserted above lacked merit and accordingly determined that petitioner's appellate counsel did not act deficiently in failing to raise those arguments on direct appeal. Lod. Doc. 11 at 3. This conclusion was reasonable in light of the clearly established Supreme Court precedent.

Petitioner also contends that his appellate counsel created a conflict of interest by continuing to represent petitioner after petitioner had filed a lawsuit against her in federal court, which presumptively prejudiced petitioner. The state court addressed this issue and determined that petitioner had provided evidence indicating only that he had filed a complaint form against his appellate counsel in the U.S. District Court for the Eastern District of California; his state petition provided no indication as to the then-present status of his lawsuit. Lod. Doc. 11 at 3. A review of the state petition, and petitioner's present petition, which has the exact same attached documents the state court found lacking, demonstrates that the state court's denial of petitioner's claim was reasonable. See Ptn., Lod. Doc. 10.

Moreover, there is no clearly established Supreme Court precedent establishing that the mere filing of a lawsuit by a criminal defendant against his or her counsel gives rise to an ineffective assistance of counsel claim under the Sixth Amendment when counsel continues to

represent that defendant in his or her criminal proceedings. Indeed, as the Ninth Circuit Court of Appeals has noted, "no Supreme Court case has held that an 'irreconcilable conflict' between the defendant and his appointed appellate counsel violates the Sixth Amendment." Foote v. Del Papa, 492 F.3d 1026, 1029 (9th Cir. 2007). "Nor has the Supreme Court held that a defendant states a Sixth Amendment claim by alleging that appointed appellate counsel had a conflict of interest due to the defendant's dismissed lawsuit against the public defenders office and appointed pre-trial counsel." Id. Because there is no clearly established Supreme Court precedent squarely addressing the claim petitioner raises, let alone providing an opinion that would favor petitioner's position, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" Wright, 552 U.S. at 126 (quoting Carey v. Musladin, 549 U.S. 70, 77 (2006)). Accordingly, petitioner's ineffective assistance of appellate counsel claim should be denied.

CONCLUSION

Based on the foregoing, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 7, 2016

11 prum0905.hc

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE